C. V. HAGAR, Appellant,

v.

Bill WILLIAMS, d/b/a Bill Williams Service & Supply, Appellee.

No. 9060.

Court of Civil Appeals of Texas, Amarillo.

Dec. 31, 1979.

Jim Pete Hale, Brownfield, for appellant.

Key, Carr, Evans & Fouts, Tom Parrish, Lubbock, for appellee.

REYNOLDS, Chief Justice.

By a bench-trial judgment, appellee recovered on an open account against appellant's defense and counterclaim for monetary damages on the ground he was charged interest in excess of double the amount of interest allowed by law. Because appellee charged appellant interest when no interest is permitted by law, appellant is, and appellee is not, entitled to judgment. Reversed and remanded with instructions.

1. An excerpt from Williams' testimony is recorded thusly:

  Q.  [Hagar's attorney]: Now, the figures that you have just testified as to the amount of

Appellee Bill Williams owns and operates a petroleum distributorship and a garage in Jayton under the name Bill Williams Service & Supply. A mechanic, Bert Daniels, works on motor vehicles in the garage on a commission basis. Appellant C. V. Hagar, a Kent County farmer, has been a long-time business customer of Williams. Hagar's credit purchases were carried by Williams as an open account which Hagar paid periodically.

Williams' open account charges are entered on his printed statement form which he maintains as a permanent ledger, and a machine copy of the form is sent as the billing statement. The statement has this imprint: "INTEREST WILL BE CHARGED ON ACCOUNTS OVER 60 DAYS OLD AT THE RATE OF 8 PER CENT PER YEAR." There was, however, no oral or written agreement for Williams to charge or for Hagar to pay any interest on the open account and, prior to the transaction giving rise to this litigation, Williams never charged and Hagar never paid a service or interest charge on the account.

On 1 June 1977, the account had a zero balance. During the month, Hagar's tractor was repaired in Williams' garage by Daniels. The cost of the repair parts and Daniels' labor commission were paid by Williams. The $2,643.86 total charge for parts and labor was entered on, and added to the balance of, Hagar's open account with Williams. A question of warranty coverage for some portion of the tractor repairs arose and, when Hagar received a statement, he telephoned and advised Williams that he was not going to pay the repair bill because the warranty was misrepresented.

Thereafter, Williams entered service charges on the open account.[1] As introduced in evidence, the statement of account reflects these entries from and after the disputed transaction:

  service charges made, were in fact, put on your permanent ledger card and were charged by you?

  A.  [Williams]: Yes, those charges were.

STATEMENT

BILL WILLIAMS SERVICE & SUPPLY

\* \* \*

C. V. Hagar
Girard, Texas

1977

\* \* \* \* \*

| DATE | DESCRIPTION | CHARGE | PAID | BALANCE |
|------|-------------|--------|------|---------|
| | \* \* \* \* \* | | | |
| 6–22 | Shop In. | 2643.86 | | 2981.74 |
| 6–15 | Credit belt Ret. | | 5.56 | 2976.18 |
| 7–9 | 223 B | 73.59 | | 3049.77 |
| 8–11 | 176 B | 58.08 | | 3107.85 |
| 11–1 | Ser. Chg. for 1 mo. | 31.07 | | 3138.92 |
| 12–1 | Ser. Chg. [2 check marks] | 31.38 | | 3170.30 |
| 1–1–78 | [2 check marks] | 31.70 | | 3202.00 |
| 2–1–78 | [2 check marks] | 32.02 | | 3234.02 |

Williams sent Hagar a statement each month a service charge was added, seeking payment of the balance shown on the statement.[2] On 6 February 1978, Williams' attorney wrote Hagar that if the sum of $2,643.86 was not paid within ten days, suit for collection of that sum and an additional $800 as attorney's fees would be filed. Hagar did not pay and, approximately a month later, this litigation began.

Williams' original petition, prepared by the attorney who authored the letter, was in the form of a sworn account, which was verified by Williams' affidavit. By that petition, Williams sought to recover a total of $3,234.02—consisting of the principal account balance on 11 August 1977 of $3,107.85 plus the added service charges totaling $126.17—as reflected by the statement of the account appearing above, together with interest and $1,075 as attorney's fees. To the petition, Hagar filed his verified answer, admitting all charges and credits except for the charge of $2,643.86 and the service charges of $126.17, which he denied are just and true, and asserting that the service charges are interest in excess of double the amount of interest allowable by Texas Revised Civil Statutes Annotated, Articles 5069–1.03 and 5069–1.06 (Vernon 1971),[3] and, therefore, constitute usury. By

2. Specifically, Williams' testimony concerning the November and December, 1977, billings, is:

Q. [Hagar's attorney]: [O]n November 1, 1977, did you send a bill out to Mr. Hagar asking that he pay $31.07 service charge?

A. [Williams]: We sent the bill, yeah.

Q. You did?

A. Yes.

Q. And on December 1, of '77, did you send a bill out asking that he pay $31.07 service charge plus an additional $31.38 service charge?

A. I guess we did.

Q. You did?

A. Yes.

\* \* \* \* \* \*

Q. Mr. Williams, did you add the service charge to the balance?

A. You bet.

Q. And that was the principal amount that you were sending the bill out for?

A. Yes.

3. Article 5069–1.03 provides:

When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all written contracts ascertaining the sum payable,

way of counterclaim, Hagar sought to recover twice the amount of interest charged, the forfeiture of the principal of and interest charged on the account, and reasonable attorney's fees.

Using the services of present counsel, Williams amended his petition, setting out his claim as the $3,107.85 principal balance of the open account on 11 August 1977, and seeking judgment for that amount with interest thereon at the rate of six percent from 1 January 1978, together with $1,000 for attorney's fees. Addressing Hagar's counterclaim, Williams denied that the service charges constitute usurious interest. He then alleged that the service charge was less than six percent per annum for the time the account was due and, alternative-

from and after the time when the·sum is due and payable; and on all open accounts, from the first day of January after the same are made.
  Article 5069–1.06(1) and (2) read, in part:
  (1) Any person who contracts for, charges or receives interest which is greater than the amount authorized by this Subtitle, shall forfeit to the obligor twice the amount of interest contracted for, charged or received, and reasonable attorney fees fixed by the court provided that there shall be no penalty for a violation which results from an accidental and bona fide error.
  (2) Any person who contracts for, charges or receives interest which is in excess of double the amount of interest allowed by this Subtitle shall forfeit as an additional penalty, all principal as well as interest and all other charges and shall pay reasonable attorney fees set by the court; . . . .

4. The court denied Hagar the use of the evidential value and admission into evidence of Williams' original petition when Williams objected on the ground it was a superseded pleading, even though Williams identified his original petition and acknowledged he swore to the service charges asserted therein. Hagar does not complain of the ruling; thus, the superseded pleading is ignored on appeal notwithstanding that the statements made therein which are inconsistent with Williams' trial position were admissible, *Houston, E. & W. Ry. Co. v. De Walt,* 96 Tex. 121, 70 S.W. 531, 537–38 (1902), and particularly so because Williams had verified those statements by his affidavit. *Barrett v. Featherston,* 35 S.W. 11, 13 (Tex.Civ.App.), *aff'd,* 89 Tex. 567, 36 S.W. 245 (1896).

5. Williams explicitly directs attention to this testimony by Hagar:

ly, that any service or interest charge in excess of eight percent per annum was due to accidental and bona fide error and he had no intention of attempting to charge usurious interest. Williams further pleaded that in no event was the amount charged for service charge or interest in excess of double the amount allowed by law. Hagar stood on his original answer, which was supplemented, and his counterclaim.

█ At a bench trial on the live pleadings, the court heard the details of the evidence summarized above.[4] Included within that evidence were Hagar's responses to questions about demands for payment,[5] and Williams' testimonial explanation of the service charges.[6]

Q. [Williams' attorney]: About the time you got this statement here, which apparently was dated last February, you got a letter from Mr. Williams' lawyer at that time, was asking you to pay at that time, was $2,643.86, which is the amount due on the tractor, isn't it?
A. [Hagar]: Yes.
Q. That's all in the world they ever ask you to pay in the way of a demand, isn't it?
A. Uh-huh.
Q. Your answer is yes, isn't it?
A. Yes.
                *    *    *    *    *    *
Q. You have never paid any interest either, have you?
A. No.
Q. And the fact is, in your conversation with him, he didn't ask you to pay any interest, did he?
A. No.

6. When Williams was queried by his attorney relative to the service charges, these exchanges were recorded:
Q. [Williams' attorney]: Now, then you made an entry there showing four charges of thirty some odd dollars—about $126.00, and did you do that intending trying to charge interest above the legal rate or anything of that kind?
A. [Williams]: The only thing, I wanted him to come in and let's talk about it, and if we can get the thing settled and knock the interest off.
Q. Did you have any intention of trying to collect the interest, if he would come in and pay the account?
A. No.
                *    *    *    *    *    *
Q. Now, did you, in a conversation with him relay that information to him that you weren't going to charge him that interest?

The court's 13 November 1978 judgment decrees that Hagar take nothing, and that Williams recover from Hagar the sum of $4,257.40, bearing interest at the rate of nine percent per annum from date of judgment. The $4,257.40 is the aggregate of Williams' amended claim for $3,107.85, with interest thereon at the rate of six percent per annum from 1 January 1978 to date of judgment in the sum of $149.55, and reasonable attorney's fees of $1,000.

At Hagar's request, the court made and filed findings of fact and conclusions of law. Among the factual findings made are these paraphrasings: Williams added the service charges on the dates and in the amounts shown on the statement; the service charges are the same as interest charges; and Williams' subjective intent was not to collect the service charges or interest. The court concluded that Williams had no right to add service charges or interest on the account until 1 January 1978; but, viewing Hagar's defense and right to recover on his counterclaim to be governed by the determination of usury, the court employed the doctrine of spreading interest[7] and ascertained that the interest charged, when spread over the period of the account, was not usurious and concluded that, in the absence of usury, the penalties provided by Article 5069–1.06 were not applicable. Neither party has formally challenged the court's factual findings.

Appealing, Hagar contends that under the facts in this case, the court erred in concluding that usury did not exist, in applying the doctrine of spreading, and in finding that the penalties provided by Article 5069–1.06 do not apply. Williams first counters that because Hagar failed to secure a factual finding that there was an interest charge, either during the interest-free period specified in Article 5069–1.03 or

A. I offered to discount like I told you—all of my profits, you know, if he would just settle it, and he wouldn't do it.

    *    *    *    *    *    *

Q. Did you have any intention of making any charge other than just what the law allowed you to make on it?

A. I certainly didn't.

at an usurious rate after the interest-free period, and has not attacked the court's "apparent" finding that no usurious interest was charged, the judgment must be affirmed.

At the outset, two observations are appropriate. First, without a challenge to the evidential support for the court's factual findings, the facts found are binding on the appellate court; yet, the reviewing court is not bound by incorrect conclusions of law drawn from those facts, *Adams v. American Quarter Horse Ass'n*, 583 S.W.2d 828, 833–34 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.), and a fact judicially admitted does not require a finding thereof, 2 C. McCormick and R. Ray, *Texas Law of Evidence* § 1127 (2d ed. 1956), for the fact is established as a matter of law, *Valdes v. Moore*, 476 S.W.2d 936, 940 (Tex. Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.), and precludes the trial court from finding any facts to the contrary. *Miller v. First State Bank*, 551 S.W.2d 89, 102 (Tex.Civ.App.—Fort Worth 1977), *aff'd as modified*, 563 S.W.2d 572 (Tex.1978).

Second, we need not focus on usury. Despite Hagar's conclusory allegation of usury, the trial court's conclusion that usury was the determinative issue, and Williams' assertion that an affirmance is justified for the lack of established usury, the controlling issue is interest legally allowable. Hagar did not plead a contract for usurious interest; factually, he pleaded charges of interest in excess of double the amount allowed by law. Except as otherwise authorized by law, Article 5069–1.02 fixes the maximum amount of interest at ten percent per annum, declares that a rate of interest greater than ten percent per annum shall be deemed usurious, and then proclaims:

Q. All right. Did you have any information from any source that you had a certain limitation on interest that you could put on an account?

A. I was completely unaware of it.

7. The doctrine of spreading interest is detailed in *Tanner Development Co. v. Ferguson*, 561 S.W.2d 777 (Tex.1977).

All *contracts* for usury are contrary to public policy and shall be subject to the appropriate penalties prescribed in Article 1.06 of this Subtitle (emphasis supplied).

It is undisputed that there was no contract between Williams and Hagar providing for the payment of interest. Equally undisputed is that this litigation is grounded on an open account. The rate and commencement of interest on an open account are governed by Article 5069–1.03, which speaks of interest allowed, not usury. *Accord, Houston Sash and Door Co., Inc. v. Heaner*, 577 S.W.2d 217, 221 (Tex.1979).

Thus, the issue is whether Williams charged Hagar interest in excess of double the amount of interest allowed by Article 5069–1.03 so as to invoke the penalty provisions of Article 5069–1.06(2). If so, Hagar must prevail; if not, the judgment must be affirmed.

As dispositive of the issue, Williams interposes and furnishes a negative answer to this question: did he, within the meaning of the statute, "charge" Hagar interest? Williams' negative answer evolves from his interpretation of *Windhorst v. Adcock Pipe and Supply*, 547 S.W.2d 260 (Tex.1977), and its application to his representation of the record. In *Windhorst*, the Supreme Court held that one who unilaterally charges to his customer's open account interest in excess of the amount authorized by law shall be liable for the penalties set forth in Article 5069–1.06. Williams perceives *Windhorst* as determining only the effect of charging interest without defining the term "charge," and impliedly holding that the act of charging interest involves three steps, viz.: (1) notation of interest charges on the books; (2) mailing of statements reflecting the interest charges to the debtor; and (3) making demand for payment of the charges. Williams then reasons that the evidence produced and the findings obtained do not show that Hagar was ever "charged" interest. We are not persuaded to the correctness of these views.

■ Logically, the debtor, without knowledge from some source of the interest charged to his account, would have no occasion to seek any recourse provided by the statute, but it does not follow that the mailing of a statement showing the interest charged and a demand for its payment are prerequisites for a charge of interest within the meaning of the statute. The statute itself does not require such notice and demand for payment of the interest charged. In *Windhorst*, the Court noted the Legislature made it clear that a charge of unlawful interest would trigger the statutory penalties and then imposed the sanction of the statute to a claim "that the charging *alone* of excessive interest constitutes usury (emphasis supplied)." *Windhorst v. Adcock Pipe and Supply*, supra, at 260–61. The sense in which the term "charges" is statutorily used and given effect in *Windhorst* is consistent with its applicable dictionary definition, to-wit: "13. To place something to the account of as a debt; to debit . . . as, to charge a sum to one." Webster's New International Dictionary (2d ed.). Resultantly, we are led to the holding that, contra to Williams' view, the term "charges" as used in the statute means unilaterally placing on an account an amount due as interest.

■ Williams judicially admitted that he charged the service charge amounts to Hagar's open account—see marginal note 1— and the court found that the charges totaling $126.17 were added as interest. It, therefore, is conclusive that Williams "charged" Hagar interest.

Moreover, even under Williams' view of the steps required for charging interest, the record demonstrates that he charged interest. In this connection, Williams asserts that, as shown by Hagar's testimony set forth in marginal note 5, Hagar denied he received a statement with the interest charges until February, 1978, and stated the only demand he ever received was for payment for the repair bill. Williams argues that there was no mention of service charges in the letter and, hence, Hagar received no demand for payment of the service charges. However, neither Hagar's testimony nor the reasonable inferences to

be drawn therefrom establishes the lack of notice and demand for payment of the interest charges. The inquiry of Hagar was limited to the demand made in the letter; he was not asked about the billing statements. His testimony leaves uncontradicted Williams' testimony, a portion of which is reproduced as marginal note 2, clearly evidencing that he billed Hagar each month a service charge was added, asking Hagar to pay the service charges. So, under either our holding or Williams' criterion, Williams charged Hagar interest within the scope of the excerpt from *Moore v. Sabine National Bank of Port Arthur*, 527 S.W.2d 209, 212 (Tex.Civ.App.—Austin 1975, writ ref'd n.r. e.), that "a charge could be 'the debiting of an amount due or more certainly, an act by the promisee constituting or implying a demand for its payment, e. g., the inclusion in a statement of indebtedness submitted to the debtor.'"

Given the charges of interest, the inquiry turns to whether the interest charged is allowed by law. Williams charged Hagar interest in November and December of 1977, the calendar year in which the unpaid account began. As the court correctly concluded, Williams had no right to add interest on the account until 1 January 1978. Article 5069–1.03 clearly permits no interest on open accounts during the calendar year in which the account is made and, therefore, any interest charged is in excess of double the amount allowed; *i. e.*, in excess of twice zero. *Houston Sash and Door Co., Inc. v. Heaner, supra*, at 221. Consequently, Williams is subject to the penalties prescribed by Article 5069–1.06(2)—*i. e.*, twice the amount of interest charged ($126.17 × 2 = $252.34), forfeiture of all principal as well as interest charged ($3,107.85 + $126.17 = $3,234.02), and reasonable attorney fees set by the trial court.[8]

Accordingly, the judgment of the trial court is reversed. The cause is remanded to the trial court with instructions to render judgment decreeing that: Bill Williams, d/b/a Bill Williams Service & Supply, forfeit all principal and interest charges on the open account and take nothing by his action; and C. V. Hagar do have and recover of Bill Williams, d/b/a Bill Williams Service & Supply, the sum of $252.34, together with the amount of reasonable attorney fees to be determined by the trial court.

---

8. Williams raises no appellate contention that his actions resulted from an accidental and bona fide error.